IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 82553-4-I |
| Respondent, | |
| v. | DIVISION ONE |
| DWAYNE ANTWON JOHNSON JR., | UNPUBLISHED OPINION |
| Appellant. | |

SMITH, C.J. — Dwayne Johnson appeals a jury verdict finding him guilty of second degree assault and of eight counts of violating a no-contact order. He contends that (1) the court erred in finding his two prior misdemeanor convictions could be used to elevate later violations to felonies, (2) the admission of Darryce Caldwell's prior written statement violated ER 801, (3) Caldwell's testimony as to a prior assault violated ER 404(b), (4) the admission of recorded jail phone calls violated ER 403, (5) the court erred in denying his motion to sever, and (6) the admission of recorded jail phone calls violated his equal protection rights. Because we do not find his arguments persuasive, we affirm.

FACTS

Relationship and Prior Incidents

Dwayne Johnson and Darryce Caldwell dated for approximately two years and lived together for the entirety of their relationship. According to Caldwell, the two had their disagreements, but generally got along well. However, in August

2018, a bystander witnessed Johnson punch Caldwell and knock her to the ground and then punch her a second time while on the ground.  When the bystander confronted Johnson, telling him to "knock it off," Johnson allegedly pulled a handgun out of his pocket, chambered a round, and threatened to shoot the bystander.  Johnson was charged with and convicted of assault.  The court entered a no-contact order (NCO) in September 2018.

Johnson and Caldwell continued their relationship despite the NCO. About nine months after the assault, but before the matter proceeded to trial, Johnson violated the NCO.  Shortly after midnight on June 12, 2019, Caldwell called the police and relayed that she and Johnson had an in-person argument at her apartment.  When the argument escalated, Caldwell decided to leave for her mother's house.  Johnson followed Caldwell in his vehicle.  While driving, Caldwell called her mother.  Police corroborated the events with Caldwell's mother, who reported her daughter called her at about 11:20 p.m., frantically saying, "Dwayne is chasing me," and exclaiming, "He is shooting at me!" Caldwell also told police that later that evening, between 12:26 a.m. and 12:36 a.m., Johnson called her multiple times.  Caldwell reported she recognized the voice on the other end of the call as Johnson and showed officers several missed calls from Johnson's cell phone number.  Police were unable to locate any bullet holes or other evidence of the shooting and Johnson was charged with two counts of violating the NCO.  He was convicted of both counts on August 13, 2019.

2

Present Incident

On June 16, 2019, less than a week after Johnson was charged with violating the NCO, a resident at the parties' apartment complex overheard yelling from the building parking lot. The resident looked out her kitchen window and saw Johnson and Caldwell shouting at each other next to a car. Johnson appeared angry and was grabbing "wildly" at Caldwell, who was backing away in an apparent attempt to protect herself. The couple got into the car and the resident watched the ensuing struggle. She saw Caldwell's feet "flailing" at the side of the car as she tried to pull herself out and Johnson wrap his arms around her neck to pull her back into the car. The resident testified that she watched Caldwell get out of the car and begin walking away. However, she recalled that both Caldwell and Johnson eventually got back in the vehicle and sped away. Two other bystanders corroborated the resident's story and also observed Johnson hit Caldwell.

Caldwell testified that she had been trying to sell her dog, but when Johnson found out she had been considering this, he got angry. The couple started arguing inside Caldwell's car. When the argument became heated, Caldwell tried to get out of the car, but Johnson grabbed her, placing her in a headlock.[1] Caldwell finally managed to kick the door open and escape, but Johnson followed. He came up behind her and punched her around the head,

---

[1] In her affidavit to Officer Ryan Greely at the hospital, Caldwell said that Johnson had her in a "headlock" and she could not breathe. However, at trial, Caldwell recanted, asserting that she disagreed with the officer's characterization of the event and that Johnson had instead grabbed her by the arm.

3

striking her in the face.  She awoke on the ground with a headache.  She described blurry, double vision and excruciating pain.

Police eventually located the couple at a cannabis retailer.  Johnson fled on foot and was eventually apprehended by officers.  While speaking to police, Caldwell was spitting blood, her nose was bleeding, and she had a difficult time opening her eyes or standing on her own.  Caldwell told the officers that she had been hit and strangled.

An ambulance transported Caldwell to the hospital where Officer Ryan Greely of the Everett Police Department took her written statement under penalty of perjury.  After Officer Greely completed his interview, the attending emergency room physician, Dr. Nicole von Suhr, examined Caldwell.  Dr. von Suhr diagnosed Caldwell with an orbital rim fracture (a fracture of the bone surrounding the eye), a nasal fracture, soft tissue damage, and a hemorrhage into one of her sinuses.  Because the orbital rim was shattered, Dr. von Suhr determined Caldwell needed surgery, and referred her to an ear, nose, and throat surgeon.  Dr. von Suhr testified at trial that the injury was consistent with a single hard hit from a fist-sized object.

In her statement taken by Officer Greely, Caldwell stated that she "got in the car to prevent [Johnson] hitting [her] again."  But at trial, she recanted that portion of her statement and testified that she entered the car willingly.  She did not, however, change her testimony that once inside the car, Johnson told her: "You do this to me . . . this is why I put my hands on you."

Johnson was charged with kidnapping, second degree assault, and eight counts of violating a NCO. Most of the NCO violations arose while Johnson was incarcerated but continued to call Caldwell via the jail phone system. All of the calls were recorded. Of the approximately 700 calls made by Johnson to Caldwell, she answered 400, and 30 were admitted at trial.

At trial, Johnson conceded that he had assaulted Caldwell, but disputed the severity. He also contested the kidnapping charge. He conceded that the State had a "strong case" regarding the NCO violations. The jury acquitted Johnson of kidnapping, but convicted him of second degree assault and all eight NCO violations. Johnson appeals.

## ANALYSIS

On appeal, Johnson assigns error to a variety of issues, including double jeopardy and statutory interpretation issues, evidentiary rulings, and equal protection violations. We address each in turn.

### Predicate Convictions and Double Jeopardy

Johnson argues that the trial court erred in finding that his two prior misdemeanor convictions for violating an NCO could be used to elevate the NCO violations in this case to felonies. See Former RCW 26.50.110(5) (2019)[2] (elevating NCO violations to felonies where defendant has two previous misdemeanor NCO convictions). He claims that the term "previous convictions" as used in former RCW 26.50.110 is ambiguous and urges this court to interpret

---

[2] This chapter has since been repealed, but the parties cite to this RCW as Johnson was charged under it at the time.

this language to exclude prior convictions that arise from the same incident. He also contends that the two prior misdemeanor convictions violate double jeopardy because they arose from a single incident. Therefore, he maintains, they should not have been counted as the "two previous convictions" necessary to elevate his subsequent violations to a felony.

The State disagrees, arguing that the legislature did not intend such a reading of former RCW 26.50.110, that there is no double jeopardy violation, and asserting as a threshold matter that Johnson waived these issues by not raising them below. We conclude that Johnson did not waive the issues below, the statute is not ambiguous, there is no double jeopardy violation, and that Johnson had the requisite two previous convictions for elevating his later NCO violations.

1. Waiver

In general, the failure to raise an issue before the trial court waives the issue on appeal under RAP 2.5(a). State v. Glover, 4 Wn. App. 2d 690, 693, 423 P.3d 290 (2018).

Here, Johnson raised both his statutory interpretation and double jeopardy arguments below. Before trial, Johnson moved to dismiss counts 4-10 for violations of the NCO as a double jeopardy violation. Johnson also moved to dismiss counts 5-10 for felony violations of the NCO, arguing that former RCW 26.50.110 was ambiguous and the language "two previous convictions" should be interpreted as meaning "convictions for two separate instances." Johnson raised both issues again at trial. The State concedes that Johnson raised an interpretation issue below, but asserts that he cannot raise a different

6

interpretation argument about the same statute on appeal.  This is unpersuasive.

Johnson's statutory interpretation argument before the trial court and before this

court concern the same core issue: whether the language "two prior convictions"

could be used to elevate his later charges.  Therefore, he did not waive this

argument.

     2.   <u>Statutory Interpretation</u>

Statutory interpretation is a question of law, which we review de novo.

<u>State v. Haggard</u>, 195 Wn.2d 544, 547, 461 P.3d 1159 (2020).  The court's duty

is to ascertain and carry out the legislature's intent.  <u>State Dept. of Ecology v.

Campbell & Gwinn, LLC</u>, 146 Wn.2d 1, 9, 43 P.3d 4 (2002).  "If the meaning of

the statute is plain on its face, we 'give effect to that plain meaning as an

expression of legislative intent.' "  <u>Haggard</u>, 195 Wn.2d at 548 (quoting <u>Campbell

& Gwinn</u>, 146 Wn.2d at 9-10.  To determine the plain meaning of a statute, courts

look to the text of the statute, as well as the context of the statute, related

provisions, and the statutory scheme as a whole.  <u>Campbell & Gwinn</u>, 146 Wn.2d

at 10.  Undefined terms are given their plain and ordinary meaning unless a

contrary legislative intent is indicated.  <u>Haggard</u>, 195 Wn.2d at 548.  A term is

ambiguous if it is susceptible to more than one reasonable interpretation.

<u>Haggard</u>, 195 Wn.2d at 548.  If the court determines an undefined term is

ambiguous, then it "may resort to statutory construction, legislative history, and

relevant case law for assistance in discerning legislative intent."  <u>Christensen v.

Ellsworth</u>, 162 Wn.2d 365, 373, 173 P.3d 228 (2007).

Under former RCW 26.50.110(5), a misdemeanor NCO violation is elevated to "a class C felony if the offender has at least two previous convictions for violating the provisions of an order issued under [the] chapter." The previous convictions "may involve the same victim or other victims specifically protected by the orders the offender violated." Former RCW 26.50.110(5). This court previously interpreted "two previous convictions" under the statute to occur "when there are two prior pleas of guilty, two prior jury verdicts of guilt, or one prior plea and one prior jury verdict of guilt to the charges specified in the statute." State v. Rice, 116 Wn. App. 96, 101, 64 P.3d 651 (2003). Here, there are two prior jury verdicts finding Johnson guilty of violating a NCO.

Still, Johnson argues that Rice is inapplicable and that the phrase "two prior convictions" is ambiguous. And because of this ambiguity, he asserts that there was insufficient evidence to support his conviction for a felony based on the two prior NCO convictions. He instead urges this court to look to RCW 9.96.060(2)(f)(ii) to interpret the phrase "previous conviction." He claims that RCW 9.96.060's definition of "previous conviction" is more applicable because it clarifies that a domestic violence conviction arising out of a single incident does not qualify as a previous conviction. In response to Johnson's sufficiency argument, the State asserts that Johnson's claim is barred as invited error because Johnson stipulated that the two prior NCO counts constituted two separate convictions.

But "two prior convictions" is not ambiguous and therefore, Rice is dispositive of this issue. We decline to reach Johnson's sufficiency argument or the State's invited error claim.

### 3. Double Jeopardy

The double jeopardy clauses of the United States and Washington Constitutions protect against multiple punishments for the same offense. State v. Muhammad, 194 Wn.2d 577, 615-16, 451 P.3d 1060 (2019). To determine whether double jeopardy principles are violated when a defendant is convicted of multiple violations of the same statute, the court looks to what "unit of prosecution" the legislature intended to be the punishable act under the statute. State v. Tvedt, 153 Wn.2d 705, 710, 107 P.3d 728 (2015). The "unit of prosecution" may be an act or course of conduct. Tvedt, 153 Wn.2d at 710. "Multiple convictions are proper only where the facts of the case support multiple units of prosecution committed." State v. Westling, 145 Wn.2d 607, 612, 40 P.3d 669 (2002). This court previously determined that the unit of prosecution for a NCO violation under RCW 26.50.110 is "each single violation of a no-contact order." State v. Brown, 159 Wn. App. 1, 10-11, 248 P.3d 518 (2010). We review the interpretation and application of the double jeopardy clause de novo. State v. Knight, 162 Wn.2d 806, 810, 174 P.3d 1167 (2008).

Here, the record does not permit consideration of Johnson's argument that the prior convictions were a continuing course of conduct. Though Johnson urges us to analyze "the nature of the evidence the State relied on to obtain [the prior] separate convictions," those convictions are not on appeal. Rather, they

stem from a separate Everett Municipal Court proceeding. He cannot now collaterally attack them via this appeal. Therefore, Johnson's later NCO violations were appropriately elevated and the State did not violate double jeopardy principles.

ER 801

Johnson next argues that the court erred in admitting Caldwell's prior written statement, taken by Officer Greely while she was being treated at the hospital, as substantive evidence under ER 801. We conclude that the court did not err in admitting the statement, which was sufficiently reliable.

1. Admission of Caldwell's Statement

Hearsay statements are not typically admissible. ER 802. Under ER 801(d)(1)(i), however, a prior inconsistent statement is not hearsay if it is "given under oath subject to penalty of perjury at a trial, hearing, or other proceeding, or in a deposition." "Because such a statement is not hearsay, it is admissible at trial as substantive evidence." State v. Otton, 185 Wn.2d 673, 679, 374 P.3d 1108 (2016).

The Washington Supreme Court has declined to categorically rule whether a police interview is either always or never considered an "other proceeding." State v. Smith, 97 Wn.2d 856, 860-61, 651 P.2d 207 (1982). Rather, to determine whether the interview was an "other proceeding," courts analyze the facts of the case and the purposes of the hearsay rule. State v. Nieto, 119 Wn. App. 157, 162, 79 P.3d 473 (2003).

In making this determination, the court considers the reliability of a prior inconsistent statement using the following factors: " '(1) whether the witness voluntarily made the statement, (2) whether there were minimal guarantees of truthfulness, (3) whether the statement was taken as standard procedure in one of the four legally permissible methods for determining the existence of probable cause, and (4) whether the witness was subject to cross examination when giving the subsequent inconsistent statement.' " State v. Phillips, 6 Wn. App. 2d 651, 672, 431 P.3d 1056 (2018) (quoting State v. Thach, 126 Wn. App. 297, 308, 106 P.3d 782 (2005). Reliability is the key to this analysis. Smith, 97 Wn.2d at 861. A decision to admit or exclude evidence is reviewed for an abuse of discretion. State v. Griffin, 173 Wn.2d 467, 473, 268 P.3d 924 (2012). "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

Here, given the facts of the case, the trial court did not abuse its discretion in admitting Caldwell's statement from the police interview. Johnson does not argue or offer any evidence that the statement Caldwell made to police, or her signature on the affidavit, was not voluntary. It is undisputed the police obtaining Caldwell's signed statement is one of the four legally permissible methods for determining the existence of probable cause under factor three. See Phillips, 6 Wn. App. 2d at 673 ("It is well settled that the police obtaining [a] signed victim statement is one of the four legally permissible methods for determining the existence of probable cause under factor three."). And neither party disputes that

Caldwell testified at trial subject to cross-examination about her prior written statement. The only issue is whether there was sufficient evidence to demonstrate there were minimal guarantees of truthfulness under factor two.

Phillips considered this issue in a similar factual context. There, a victim of domestic violence signed a sworn statement describing an assault and later recanted at trial, testifying that she did not remember the officer reading her the statement, that she did not know if it was signed under penalty of perjury, and that the statement was not in her own words. Phillips, 6 Wn. App. 2d at 670, 674. This court found that minimal guarantees of truthfulness were present because the declarant had signed her statement under the "penalty of perjury" language and because the officer testified to reading the statement back to her, including the "penalty of perjury" language. Phillips, 6 Wn. App. 2d at 673-74.

Here, Caldwell did not dispute at trial that she signed the statement voluntarily or that she gave a statement to the officer. Rather, Johnson argues that Caldwell was not in a proper mental state to give a statement because she was medicated at the time. But this assertion conflicts with testimony of the officer who took the statement, Officer Greely, and of the treating emergency room physician, Dr. von Suhr. Dr. von Suhr testified at trial that Caldwell had not been given medication before her initial medical evaluation, which was after her interview with Officer Greely. Both Officer Greely and Dr. von Suhr testified that Caldwell was coherent and able to answer questions. And Officer Greely also testified that he followed standard procedure for taking victim statements,

including reading the statement back to Caldwell line by line and informing her that she would be signing it under penalty of perjury.

Moreover, the court decided to admit all three of Caldwell's prior statements, two of which supported Johnson's theory of the case. The court noted that in "[b]orderline situations"—where the witness's prior statement is quite detailed, but at trial the witness claims to have forgotten those details—the court has "considerable discretion to do what seems fair and reasonable." Therefore, the court explained that it would not "highlight[] one statement [Exhibit 34] . . . to the exclusion of others," and that it felt the jury "would probably like to see all the statements."

Accordingly, we conclude that the trial court did not err in admitting the statement under ER 801(d)(1)(i) because trial court did not abuse its discretion in finding there were minimal guarantees of truthfulness under factor two.[3] We note, too, that in cases such as this, "the inconsistent statement is more likely to be true than the testimony at trial as it was made nearer in time to the matter to which it relates and is less likely to be influenced by factors such as fear or forgetfulness." Smith, 97 Wn.2d at 861.

---

[3] And, relevant here, Johnson's argument regarding reliability of Caldwell's statement implicates her credibility as a witness, a matter to be resolved by the jury that heard her testimony. Credibility determinations are not within the purview of this court. State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990) ("Credibility determinations are for the trier of fact and cannot be reviewed on appeal.") abrogated on other grounds by State v. Crossguns, 199 Wn.2d 282, 505 P.3d 529 (2022).

<u>ER 404(b)</u>

Johnson next asserts that the trial court erred in allowing Caldwell to testify that Johnson assaulted her in 2018 in violation of ER 404(b). We conclude that the trial court did not abuse its discretion in admitting the testimony.

We review the trial court's determination to admit or exclude evidence for an abuse of discretion. <u>State v. Foxhoven</u>, 161 Wn.2d 168, 174, 163 P.3d 786 (2007). The appellant bears the burden of proving the court abused its discretion. <u>State v. Wade</u>, 138 Wn.2d 460, 464, 979 P.2d 850 (1999).

ER 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The rule prohibits certain types of evidence from being used to prove character of a person or to show action in conformity with that character, but allows that same evidence to be introduced for any other purpose, provided that it is relevant and its probative value outweighs the danger of unfair prejudice. <u>State v. Gresham</u>, 173 Wn.2d 405, 420, 269 P.3d 207 (2012). A court's decision to admit evidence of prior bad acts depends heavily on the facts of the case and the purpose for which the evidence is sought to be introduced. <u>State v. Ashley</u>, 186 Wn.2d 32, 44, 375 P.3d 673 (2016).

In recent years, Washington courts have been persuaded to admit evidence of prior acts of domestic violence on theories tied to the characteristics

of domestic violence itself, such as proving the alleged victim's state of mind when it is an element of the charged offense.  Ashley, 186 Wn.2d at 44; see, e.g., State v. Fisher, 165 Wn.2d 727, 744-45, 202 P.3d 937 (2009) (allowing evidence of past physical abuse to demonstrate the victim's fear of the defendant and explain the apparent inconsistency of the victim not reporting the full extent of the abuse earlier).  The courts have allowed evidence of prior acts of domestic violence to support a witness's credibility after their testimony changed on the grounds that the jury was entitled to evaluate the witness's credibility with full knowledge of the dynamics of a relationship marked by domestic violence and the effects such a relationship has on the victim.  State v. Magers, 164 Wn.2d 174, 186, 189 P.3d 126 (2008) ("We . . . conclude that prior acts of domestic violence, involving the defendant and the crime victim, are admissible in order to assist the jury in judging the credibility of a recanting victim."); see also State v. Harris, 20 Wn. App. 2d 153, 157-58, 498 P.3d 1002 (2021) (trial court properly allowed evidence of prior assault to help jury in judging victim's credibility where victim recanted at trial); State v. Woods, 198 Wn. App. 453, 459-60, 393 P.3d 886 (2017) (evidence that defendant previously forced victim into prostitution against her will relevant in assault trial to explain nature of victim's relationship to defendant and her delay in reporting assault to police).

But evidence of prior acts is not admissible "where there is no evidence of injuries to the alleged victim and the witness neither recants nor contradicts prior statements."  State v. Gunderson, 181 Wn.2d 916, 925, 337 P.3d 1090 (2014); see also Ashley, 186 Wn.2d at 47 (trial court improperly admitted evidence of

15

prior assault where victim's testimony at trial was consistent with prior statements to police).

Here, case law squarely supports admitting Caldwell's testimony on the basis of providing the jury with full knowledge of the dynamics of her and Johnson's relationship. Caldwell's state of mind was an element of the kidnapping charge, for which the State was required to prove that Johnson restricted Caldwell's movements without consent. Evidence of the prior assault highlights the effects of the relationship on Caldwell and gives context to her actions in this case, such as why she agreed to get in the car with Johnson after he assaulted her. It also explains her inconsistent testimony at trial and why it differed from her sworn statement to Officer Greely. For example, Caldwell testified at trial that she did not recall talking to Officer Greely. But just minutes later, she recounted that she felt "out of it" and is able to describe her physical symptoms before being admitted at the hospital. And in her statement to Officer Greely at the hospital, Caldwell told the officer that, once inside the car, Johnson "pulled [her] hair to get [her] closer to him, then put [her] in a headlock." She told the officer that she "could not breathe at all" and "thought [she] was going to die." She also stated that she "got in the car to prevent [Johnson] hitting [her] again."

But at trial, her story changed. Rather than being held in a headlock, she testified that Johnson grabbed her arm. She also stated that she had no trouble breathing at any time during the altercation. And in her later annotated version of her original police statement, Caldwell indicated that her prior statement, "I thought I was going to die," was not true. When asked at trial why she got back

16

into the car with Johnson, Caldwell stated that she "wanted" to get in the car, that her keys were in the car and she didn't want to be "stuck outside." And in her first statement to Officer Greely, Caldwell stated that she "want[ed] to assist in prosecution." But in her amended statement, she wrote in all capital letters that she did not want to assist in Johnson's prosecution. It was not error for the court to admit both of Caldwell's statements—the sworn statement at the hospital and the later annotated and amended statement—in order to assist the jury in assessing the credibility of Caldwell testimony.

Johnson urges this court to "narrowly limit" the "flawed procedure" in domestic violence cases that "allows the use of propensity evidence, purportedly to protect women from themselves, but which ultimately entrenches ages-old notions that women lie and cannot be trusted." While we acknowledge that sexist notions surrounding domestic violence exist, statistics reveal that both men and women experience domestic violence at staggering rates; 47 percent of women and 44 percent of men experience contact sexual violence,[4] physical violence, and/or stalking by an intimate partner in their lifetime.[5] In adopting this exception to ER 404(b), our Supreme Court did not differentiate between male and female victims. Magers, 164 Wn.2d at 186 ("[P]rior acts of domestic

---

[4] "Contact sexual violence" includes rape, sexual coercion, and unwanted sexual contact.

[5] These figures are from The National Intimate Partner and Sexual Violence Survey's 2016/2017 Report on Intimate Partner Violence. For more information, see Centers for Disease Control and Prevention, *The National Intimate Partner and Sexual Violence Survey: 2016/2017 Report on Intimate Partner Violence* 3 (2022), https://www.cdc.gov/violenceprevention/pdf/nisvs/NISVSReportonIPV_2022.pdf [https://perma.cc/D4YH-GAYS].

17

violence, involving the *defendant* and the *crime victim*, are admissible in order to assist the jury in judging the credibility of a recanting *victim*.") (Emphases added). Moreover, the exception is already quite limited. Ashley, 186 Wn.2d at 43 (" 'To guard against this heightened prejudicial effect, we confine the admissibility of prior acts of domestic violence to cases where the State has established their overriding probative value.' ") (quoting Gunderson, 181 Wn.2d at 925). As the Court explained in Ashley, it has rejected a blanket domestic violence exception for prior bad acts, noting that " 'the mere fact that a witness has been the victim of domestic violence does not relieve the State of the burden of establishing why or how the witness's testimony is unreliable.' " 186 Wn.2d at 46 (quoting Gunderson, 181 Wn.2d at 924-25). And evidence of prior bad acts in this context is not automatically admissible even when a witness gives contradictory testimony. Ashley, 186 Wn.2d at 46 (" 'That other evidence from a different source contradicted the witness's testimony does not, by itself, make the history of domestic violence especially probative of the witness's credibility.' ") (quoting Gunderson, 181 Wn.2d at 924). We conclude that the trial court did not abuse its discretion in allowing Caldwell to testify to the 2018 assault.

### ER 403 and Jail Phone Calls

Johnson next argues that the court erred in admitting 30 jail phone calls to prove the eight NCO violations because the calls were cumulative and unduly prejudicial in violation of ER 403. Instead, Johnson maintains that the State should have admitted only eight calls as evidence of the eight NCO violations. He further asserts that the calls were used to show he was abusive towards

Caldwell and that this was propensity evidence to the kidnapping and assault charges. We conclude that the trial court did not err.

ER 403 authorizes a court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." Unfair prejudice is caused by evidence that tends to arouse an emotional, irrational, or confused response from the trier of fact. State v. Rice, 48 Wn. App. 7, 13, 737 P.2d 726 (1987). The trial court has broad discretion in making this determination and its ruling is reviewed for an abuse of discretion. State v. Bell, 60 Wn. App. 561, 565, 805 P.2d 815 (1991).

Johnson argued at trial that the calls were unduly prejudicial and cumulative. The trial court judge disagreed. The court noted that Johnson's threats to assault Caldwell made in the calls were "relevant to an argument of possible consciousness of guilt." The court reasoned that because the State only sought to admit 30 of the 700 dialed calls—400 of which connected—between Johnson and numbers associated with Caldwell, the number of calls was neither unduly cumulative or excessive. In admitting the calls, the court agreed to issue a limiting instruction allowing the jury to only hear the calls once and to not consider their content.

Though Johnson argues that the State should have only been able to present eight calls to support the eight NCO violations, the State may submit evidence of multiple acts, any one of which could support the counts charged, as long as the State either elects one incident to rely on for a conviction or a

19

Petrich[6] instruction is given. State v. Jones, 71 Wn. App. 798, 821, 863 P.2d 85 (1993). Here, the court issued a Petrich instruction, telling the jury that they needed to unanimously agree on one act for each NCO violation. Thus, we conclude the trial court did not abuse its discretion.

### Motion to Sever

Johnson next argues that the trial court erred by denying his motion to sever the assault and kidnapping charges from the NCO charges in violation of CrR 4.4(b). Johnson raised his motion before trial and renewed it during trial. We conclude that the trial court did not abuse its discretion in making this ruling.

"Joinder" refers to bringing multiple criminal charges against one person as separate counts in a single charging document. CrR 4.3(a). The court may later "join" these offenses on a party's motion if they "[a]re of the same or similar character, even if not part of a single scheme or plan" or "[a]re based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan." CrR 4.3(a)(1), (2). Offenses must be consolidated for trial when they can be properly joined. State v. Bryant, 89 Wn. App. 857, 864, 950 P.2d 1004 (1998).

On the other hand, severance refers to dividing joined offenses into separate charging documents. CrR 4.4(b). Severance may be ordered on a

---

[6] State v. Petrich, 101 Wn.2d 566, 570, 572, 683 P.2d 173 (1984). When the State presents evidence of several distinct criminal acts but charges the defendant with only a single crime, jury unanimity must be protected. In re Pers. Restraint of Mulamba, 199 Wn.2d 448, 507, 508 P.3d 645 (2022). The State must either elect a single act on which it will rely or instruct that the jurors agree the same underlying criminal act has been proved beyond a reasonable doubt. Mulamba, 199 Wn.2d at 507. Such an instruction is called a Petrich instruction.

party's motion where "the court determines that severance will promote a fair determination of the defendant's guilt or innocence of each offense." CrR 4.4(b). A defendant seeking severance has the burden of demonstrating that trial involving all counts would be so manifestly prejudicial as to outweigh the concern for judicial economy. A trial court has broad discretion to sever charges and try them separately when it is appropriate "to promote a fair determination of the guilt or innocence of a defendant." CrR 4.4(c)(2)(i). The court considers four factors in determining whether to sever charges: (1) the strength of the state's evidence on each count; (2) clarity of defenses to each count; (3) court instructions to the jury to consider each count separately; and (4) the admissibility of evidence of other crimes even if not joined for trial. State v. Bluford, 188 Wn.2d 298, 311-12, 393 P.3d 1219 (2017). Separate trials are disfavored in Washington and we review a trial court's denial of a motion to sever for abuse of discretion. State v. Emery, 174 Wn.2d 741, 752, 278 P.3d 653 (2012).

Here, each of the four factors is either neutral or weighs in favor of denying Johnson's motion to sever. In both his first and renewed motion to sever, Johnson gives little attention to the first factor; he does not indicate in either motion whether there were significant variations as to the strength of the State's evidence for each charge. He merely urges the court to "consider" the strength of the State's evidence on each count. In any event, the State had ample evidence as to each individual count; it does not appear, and Johnson does not argue, that the evidence for one count could have a bolstering effect on

a weaker count. Johnson does not provide any persuasive reason why we should determine that this first factor weighs in favor of severance.

As to the second factor, Johnson conceded that it was not "the strongest point" in favor of his argument to sever because he had a "general denial defense." A general defense is unlikely to be confusing to the jury and the second factor, clarity of defenses, does not weigh in favor of severing.

For the third factor, Johnson argues that even with an instruction to consider each count separately the jury would not be able to keep the evidence conceptually separate. But Johnson also agreed that such an instruction would be proper. And the court gave this instruction at trial. Absent indication otherwise, we presume that jury instructions are followed. State v. Dent, 123 Wn.2d 467, 486, 869 P.2d 391 (1994). The third factor weighs against severance because the jury was properly instructed and Johnson does not indicate that the jury failed to follow instructions.

Johnson focuses primarily on the fourth factor, cross admissibility of the evidence pursuant to ER 404(b), and argues that the evidence for each charge was not cross admissible. As detailed above, ER 404(b) provides that evidence of other crimes, wrongs, or acts may be admissible for purposes other than proving character or that someone acted in a like fashion. The list of "other purposes" mentioned in ER 404(b) is merely illustrative. Gresham, 173 Wn.2d at 420. Admission of evidence under ER 404(b) requires the trial court to identify the purpose for which the evidence is sought to be introduced, determine whether it is relevant to prove an element of the crime charged, and weigh the

probative value of the evidence against its prejudicial effect. State v. Lough, 125 Wn.2d 847, 853, 889 P.2d 487 (1995). This court reviews decisions to admit evidence under ER 404(b) for abuse of discretion. Foxhoven, 161 Wn.2d at 174.

Here, the court found that the jail phone calls were cross admissible as evidence of a "consciousness of guilt" as to the kidnapping and assault charges. The court reasoned that the calls "provide[d] framework" for the jury so that it did not have to view the case in a "vacuum." The State argued that the phone calls were necessary for the jury to determine the credibility of Caldwell and better understand why she might change her testimony at trial. The State noted that in the calls underlying the NCO violation counts, Johnson made references to how Caldwell needed to change her statement about the kidnapping. Evidence of prior acts, particularly in a situation involving domestic violence, is admissible under ER 404(b) for purposes of evaluating a witness's credibility after their testimony changes because such evidence is indicative of the dynamics of a relationship marked by domestic violence and its effects on the victim. Magers, 164 Wn.2d at 186. The calls gave the jury better context for understanding the dynamic between Johnson and Caldwell. They shed light on why Caldwell chose to reenter the car with Johnson and they explain why her testimony at trial differed from her sworn statement. The trial court did not abuse its discretion in ruling that the phone calls were admissible pursuant to ER 404(b).

Because each of the four elements either supports joinder or is neutral, the trial court did not err when it denied Johnson's motion to sever.

23

Privileges and Immunities and Equal Protection

Finally, Johnson argues that the trial court's admission of his recorded jail phone calls violated the privileges and immunities clause of article I, section 12 of the Washington Constitution and the equal protection clause of both article I, section 12 and the Fourteenth Amendment to the United States Constitution.  He asserts that by admitting the recorded calls, the trial court treated him differently than a wealthier defendant, who could afford to pay bail and whose calls would not be recorded and admitted at trial.  We conclude that the admission of Johnson's phone calls did not violate the United States or Washington Constitution.

1.  Privileges and Immunities

Johnson asserts that the admission of the recorded jail phone calls violated the state constitution's privileges and immunities clause because such admission "grants a special privilege to non-indigent defendants, whose personal conversations are not monitored by the government (absent a warrant) and not introduced against them at trial."  Because the trial court's decision to admit the recording does not grant either a privilege nor an immunity, we conclude there was no privileges and immunities violation.

The privileges and immunities clause of the Washington Constitution states that "[n]o law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations".  WASH. CONST. Art. I, § 12.  For a violation of article I, section 12 to occur, the law or its

application must confer a privilege to a class of citizens. Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake, 150 Wn.2d 791, 812, 83 P.3d 419 (2004). The purpose of article 1, section 12 is to "prevent favoritism and special treatment for a few, to the disadvantage of others." Ockletree v. Franciscan Health Sys., 179 Wn.2d 769, 776, 317 P.3d 1009 (2014). Courts apply a two-step analysis to determine whether a law implicates a "privilege or immunity." Martinez-Cuevas v. DeRuyter Bros. Dairy, Inc., 196 Wn.2d 506, 518-19, 475 P.3d 164 (2020). First, the court determines whether the law grants a privilege or immunity implicating fundamental rights of state citizenship. Martinez-Cuevas, 196 Wn.2d at 519. Next, if the law does implicate a privilege or immunity, the court asks whether there is nonetheless a " 'reasonable ground' " for granting that privilege or immunity. Martinez-Cuevas, 196 Wn.2d at 519 (quoting Schroeder v. Weighall, 179 Wn.2d 566, 573, 316 P.3d 482 (2014). The article 1, section 12 reasonable ground test is more exacting than rational basis review. Martinez-Cuevas, 196 Wn.2d at 523. Under the test, a court will not hypothesize facts to justify a legislative decision. Schroeder, 179 Wn.2d at 574. Rather, a court will analyze the decision to determine whether it in fact serves the legislature's stated goal. Schroeder, 179 Wn.2d at 574. Speculation will not suffice. Schroeder, 179 Wn.2d at 575.

Here, the jail's practice of recording phone calls does not violate the privileges and immunities clause because the admission of a legally recorded telephone call is not a law, nor does it grant any privilege or immunity to any person or class of persons. The admission of the phone recording in this case

has no impact on any other defendants. Accordingly, Johnson's claim to the contrary fails.

### 2. Equal Protection

Johnson argues that the admission of the recording violates the equal protection clauses of both article I, section 12 and the Fourteenth Amendment. He asserts that admitting recorded jail calls of indigent defendants burdens the fundamental right to a fair trial. He also contends that indigent defendants who are incarcerated pretrial are a semi-suspect class. Specifically, he argues that the trial court violated his right to equal protection under the law by admitting the recorded jail calls when "such recordings may not be introduced against defendants with money." Because recorded jail calls may be introduced against any defendant, regardless of wealth, we conclude that Johnson fails to establish a violation of his equal protection rights.

The equal protection clauses of the Fourteenth Amendment and article I, section 12 require that people similarly situated under the law receive similar treatment from the state. State v. Haq, 166 Wn. App. 221, 253, 268 P.3d 997 (2012). To show an equal protection violation, a defendant must establish that they received disparate treatment because of membership in a class of similarly situated individuals and that the disparate treatment was the result of intentional or purposeful discrimination. State v. Osman, 157 Wn.2d 474, 484, 139 P.3d 334 (2006). Therefore, Johnson must establish that he was treated differently than others who were similarly situated. Osman, 157 Wn.2d at 485.

Here, Johnson does not set forth adequate facts establishing that he was treated differently from others who are similarly situated. He claims that non-indigent defendants can "never" have their personal calls introduced against them because they can always bail out of jail. But Johnson neglects to acknowledge that some indigent defendants are released pretrial and that some non-indigent defendants are not.[7] Nevertheless, he still contends that he was not able to pay bail when a wealthier individual in his position could have, and thereby could have avoided having his telephone conversations recorded and introduced at trial. However, Johnson was warned that the call was subject to recording.

Even if we accept Johnson's argument that he remained in custody because he is indigent, defendants who are similarly situated for the purposes of equal protection analysis are those who, like Johnson, have made incriminating statements on legally recorded jail phone calls. Johnson sets forth no reason to believe that any defendant under these circumstances would not be subject to admission of those recordings at trial.[8]

---

[7] The fact that socioeconomic, racial, and ethnic disproportionality exists as a result of systemic racial injustices throughout our criminal justice system is indisputable. We recognize and acknowledge that low-income individuals, persons of color, and other marginalized populations often bear the lion's share of police intervention and criminal prosecution and that this contributes to the disproportionate representation of these communities in our jails and state prison system.

[8] It is not lost on us that the practical effect of the inability of indigent defendants to bail out of jail subjects them to greater surveillance than non-indigent defendants who can afford to make bail. However, that alone is not sufficient to establish that the admission of the calls violated Johnson's equal protection rights.

We affirm.

_____Smith, C.J._____

WE CONCUR:

_____Hazelrigg, A.C.J._____     _____Mann, J._____